IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HORACE JORDAN,

    *Plaintiff,*

v.

                                     Civil Action No. ELH-20-3649

THE MEBA PENSION TRUST,

    *Defendant.*

**MEMORANDUM OPINION**

This case arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq.  Captain Horace "Rick" Jordan, plaintiff, has filed suit against the MEBA Pension Trust (the "Plan"), defendant, alleging that the Plan has wrongfully denied him pension credits due to him for twelve years of service as a Licensed Deck Officer for Keystone Shipping Co. ("Keystone").  ECF 1 (the "Complaint").  Several exhibits were submitted with the Complaint.  ECF 1-3 to ECF 1-8.

The Plan is an "employee pension benefit plan" within the meaning of ERISA.  ECF 1, ¶ 6; 29 U.S.C. § 1002(2)(A).  The Plan is maintained jointly by participating employers and a labor organization, District No. 1-PCD, The Marine Engineers' Beneficial Association ("MEBA"), for the benefit of certain employees "who have collectively bargained with MEBA."  ECF 1, ¶ 7.[1]

Jordan has been a member of MEBA since 1990.  *Id.* ¶ 4.  And, he was a "'MEBA applicant'" since 1986.  *Id.*  Jordan alleges that, under the terms of a merger agreement in 1990 between the United Maritime Officers Association ("UMOA") and MEBA (the "Merger

---

[1] In 1988, the National Maritime Union ("NMU") merged with District No. 1-PCD, MEBA.  ECF 1 at 2 n.1.  From 1988 to 1993, District No. 1-PCD, MEBA "conducted its affairs under the name of District No. 1-MEBA/NMU."  *Id.*

Agreement"), he is entitled to pension credits for (1) his service on Keystone tanker vessels from 1984 to 1990 and (2) his service on "MEBA-contracted" Keystone tanker vessels from 1990 to 1995.[2]  ECF 1, ¶¶ 8, 9, 28.  The Plan disagrees.  *Id.* ¶¶ 31, 32.

The Complaint contains a single count.  *Id.* ¶¶ 36-40.  Plaintiff asserts that "[b]y wrongfully denying [Jordan] Plan pension credit due to him in accordance with the 1990 Merger Agreement . . . the Plan has failed to act in compliance with the language of the documents and the instruments governing the Plan in violation of ERISA, 29 U.S.C. §§ 1132(a), and 1104(a)(1)(D)."  *Id.* ¶ 38.

The Plan has moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 13.  The motion is supported by a memorandum (ECF 13-1) (collectively, the "Motion") and seven exhibits.  ECF 13-2–13-8.  Jordan opposes the motion, (ECF 17, "Opposition") and has submitted an additional exhibit.  The Plan replied.  ECF 18 ("Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Factual Background[3]

MEBA is a labor organization that collectively bargains with a number of employers in the maritime industry.  ECF 1, ¶ 7.  As noted, the Plan is an "employee pension benefit plan" within the meaning of ERISA.  *Id.* ¶ 6; *see also* 29 U.S.C. § 1002(2)(A) (defining employee pension

---

[2] At certain points, the Complaint alleges that Jordan has not been afforded Plan pension credit for the period of 1990 to *1996*.  *See* ECF 1, ¶¶ 9, 32.  Elsewhere, the suit specifies the period as 1990 to *1995*.  *See id.* ¶¶ 12, 27, 28.  The relief requested is for credit through 1995.  *Id.* at 14.  In any event, the discrepancy is not material to the disposition of the Motion.

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  And, I may consider the parties' exhibits in resolving the Motion.

Throughout the Memorandum Opinion, I cite to the electronic pagination.  It does not always correspond to the page number imprinted on the particular submission.

benefit plans).   MEBA and participating employers, such as Keystone, a shipping company, "maintain" the Plan.  ECF 1, ¶ 6; *see also id.* ¶¶ 7, 15.

In particular, the Plan is a "Defined Benefit Plan," pursuant to 26 U.S.C. § 414(j).  *Id.* ¶ 6. Employees earn pension credit based upon days of "Covered Employment" for a participating employer.  *See* ECF 13-5 at 6-8; ECF 13-6 at 5-9.  Participating employers are obligated to make contributions to the Plan on behalf of their employees for these periods of Covered Employment. *See* ECF 13-5 at 5; ECF 13-6 at 6.  Years of pension credit are used to determine the amount of pension benefit, and when it can be received.  *See* ECF 13-5 at 9-16; ECF 13-6 at 1-5.

Several documents are important in the operation of the Plan, including the MEBA Pension Trust Regulations (the "Regulations"); the Agreement and Declaration Establishing the MEBA Pension Plan (the "Trust Agreement"); and the Summary Plan Description ("SPD").[4]  ECF 1, ¶ 7; ECF 13-2–13-8.  The Plan is administered by a twelve-member Board of Trustees (the "Board") whose members come from MEBA as well as participating employers.  *See* ECF 13-7, § 3.1; ECF 13-8, § 3.1.  For many years, Keystone has had representation on the Board.  ECF 1, ¶ 6.  The Plan's governance is discussed in more detail *infra*.

Jordan has been employed as a Licensed Deck Officer in the maritime industry for more than forty years, and he has worked at Keystone since 1984.  *Id.* ¶¶ 10, 12.  A Licensed Deck Officer is a crew member who "oversee[s] all activities" on a ship "outside of the engine room, including the vessel's cargo and its navigation and safety."  *Id.* ¶ 10.  From 1984 to November

---

[4] The parties do not agree on the terminology as to all of these documents.  In his Complaint, Jordan defines the Pension Trust Regulations as the "Plan Document" (ECF 1, ¶ 7), and does not explicitly mention the Trust Agreement.  But, in his Opposition, Jordan defines "Plan Document" as both the Pension Trust Regulations and the Trust Agreement.  ECF 16 at 10 n.7. The Plan refers to the Regulations as the "Plan Document."  ECF 13-1 at 5-6; ECF 18 at 13, n.4.

1995, Jordan worked on Keystone's tanker vessels.  *Id.* ¶ 12.  From November 1995 to the present, he has worked on Keystone's government-contracted vessels.  *Id.*

At the time Jordan began working at Keystone, the company was in the midst of a "bitter collective bargaining dispute" with the Masters, Mates, and Pilots union ("MM&P"), *id.* ¶ 15, which had previously represented Keystone's Licensed Deck Officers.  *Id.* ¶ 14.  In September 1984, Keystone broke off negotiations with MM&P and stopped recognizing the union as the collective bargaining agent for its Licensed Deck Officers.  *Id.* ¶¶ 15, 16.  In response, 80% of the company's Licensed Deck Officers quit, and Keystone began hiring replacement crews to fill these vacancies.  *Id.* ¶ 16.

Jordan was one such replacement, hired in October 1984.  *Id.* ¶ 16, 17.  As such, when he was hired, Jordan was not a union member and had no collective bargaining agent.  *Id.* ¶ 16.  At the time of his hiring, Jordan was "provided an employment package by Keystone representatives." *Id.* ¶ 17.  However, "at no time" during Jordan's employment with Keystone has he been offered "the opportunity to participate in a Defined Benefit Plan, whether it was the Plan or any other such plan."  *Id.*

In the spring of 1986, Keystone informed Jordan that, "as a condition of employment," all Keystone Licensed Deck Officers would be required to accept the United Maritime Officers Association, a union, as their collective bargaining agent.  *Id.* ¶¶ 8, 18.  UMOA was created in 1984 to provide representation for Licensed Deck Operators left without a contract after Keystone's failure to reach an agreement with MM&P.  *Id.* ¶ 18.  Jordan asserts that, "[h]aving little choice in the matter," he became a UMOA member in 1986.  *Id.* ¶ 20.  And, he paid union dues to UMOA until 1990, when UMOA merged with MEBA.  *Id.*

According to Jordan, "UMOA's formation was directly linked to efforts by MEBA, Keystone, and other shipping companies to replace MM&P as the collective bargaining representative" for Keystone's Licensed Deck Officers. *Id.* ¶ 19.  At the time, MEBA represented Keystone's Licensed Engineer Officers (a different category of sailor), but not its Licensed Deck Officers.  *Id.* ¶ 14.  In order to avoid sanctions from the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), MEBA "worked behind the scenes" with Keystone and other companies "to sabotage MM&P contract negotiations and organize UMOA. . . ." *Id.* ¶ 19.  UMOA was organized by Charles D. Mulloy, who had "close ties" to MEBA and its then-president, C.E. "Gene" DeFries.  *Id.* ¶ 18.  The intent was that "after a period of time," UMOA "would merge with MEBA."  *Id.* ¶ 19.

These merger plans came to fruition in 1990, when UMOA members voted by a "two to one" majority to merge with MEBA.  *Id.* ¶ 26.  The merger between the two unions was governed by a "Merger Agreement."  *Id.* ¶ 8.  Following the merger, Jordan became a dues-paying member of MEBA.  *Id.* ¶ 26.

The merger followed a vigorous campaign in favor of merger by representatives of UMOA, MEBA, and Keystone, using both in-person and written communications.  *Id.* ¶¶ 21-25.  Jordan alleges that, as part of this campaign, these organizations and their authorized representatives endeavored to convince UMOA members to approve the merger by promising that, if the merger were approved, UMOA members would be able to enroll in the Plan and earn pension credits.  *Id.* ¶¶ 22-25.  Specific representations, as alleged by Jordan, are outlined below.  "Relying on the repeated promises of past, present, and future Plan pension credit for his service as a UMOA member," Jordan voted for the merger.  *Id.* ¶ 26.

Jordan states that he has received pension credits since November 1995, for his work on Keystone's government—contracted vessels. *Id.* ¶ 27 n.2. But, the Plan has refused to provide plaintiff with pension credits for his Keystone service while a UMOA member from 1984-1990, and for his service as an MEBA member on Keystone tanker vessels from 1990 to 1996. *Id.* ¶ 32.[5]

"On information and belief," Jordan alleges that "the Merger Agreement was intended to, and did in fact, amend the Plan Document" to implement the promises made by authorized representatives of MEBA and others. *Id.* ¶ 8. But, Jordan claims that the Plan has refused to provide him with a copy of the Merger Agreement, and he has not otherwise been able to obtain a copy. *Id.* ¶ 29. Nevertheless, Jordan believes that the 1990 Merger Agreement "expressly entitled" him to receive Plan pension credits for (1) his service on Keystone tanker vessels from 1984 through 1990, and (2) his service on MEBA-contracted Keystone tanker vessels as a MEBA member from 1990 through 1995. *Id.* ¶ 28. And, he "is confident" that his assertions about the content of the Merger Agreement "will have ample evidentiary support after a reasonable opportunity for further investigation and discovery . . . ." *Id.* ¶ 29. In support of his position, Jordan references various statements and documents that, in his view, demonstrate that the Merger Agreement amended "Multiple MEBA-affiliated" ERISA plans. *Id.* ¶¶ 22-30.

To illustrate, Jordan references a series of statements by Rick Morrill, "who, on information and belief, was an authorized agent of MEBA, the Plan and UMOA." *Id.* ¶ 21. Morrill was retained by DeFries, the MEBA president, and Mulloy, the UMOA president, to encourage UMOA members to vote for the MEBA-UMOA merger. *Id.* Morrill "repeatedly assured" UMOA members, including Jordan, "that UMOA Licensed Deck Officers would receive MEBA pension

---

[5] *See* note 2, *supra*, as to the discrepancy in Jordan's allegations concerning the years for which he seeks pension credits

credit—that is, credit under the Plan—for their years of service to Keystone if the merger was approved." *Id*. ¶ 22. Morrill "also promised that the Merger Agreement would allow UMOA members to enroll in—and begin accruing credits in—the Plan." *Id*. These statements, Jordan alleges, "were made by [Morrill] as an authorized agent of MEBA and of the Plan." *Id*.

In addition, Jordan points to a "barrage of notices and flyers" from UMOA and MEBA encouraging him to vote for the merger. *Id*. ¶ 23. Many of these notices "contained further assurances that the Merger Agreement would allow UMOA members to participate immediately in the Plan once the merger was approved." *Id*. Jordan cites one such flyer, a "UMOA Contract Fact Sheet" distributed by MEBA, which is attached to the Complaint. *Id*.; ECF 1-3. The fact sheet states: "District No. 1 – MEBA is committed to offering presently employed deck officers a choice when it comes to retirement benefits. You will be able to stay in a company-sponsored plan or you will be able to transfer to the MEBA Plan, depending on which option you elect." ECF 1-3.

Further, Jordan has identified statements by W.I. Ristine, Vice President of Labor Relations at Keystone and a Plan Trustee. ECF 1, ¶ 24. On March 3, 1990, Jordan received a "telex" from Ristine, explaining that "a clause in the proposed Merger Agreement required MEBA to 'use its best efforts to establish a procedure where UMOA members and applicants may elect continued participation in the UMOA negotiated plans or, in the alternative, to participate in the MEBA pension plan.'" *Id*.; ECF 1-4. The telex concluded: "Be assured that Keystone will support the ultimate position of the majority in this matter." ECF 1-4. In addition, Ristine sent a letter of April 2, 1990, explaining that recent Keystone-UMOA discussions had "led to an understanding for [a] contract extension. Included is a . . . 'Recognition' clause recognizing the successor organization and agreement to provide the same economic package provided the Licensed

Engineers in their forthcoming negotiations." ECF 1, ¶ 25; ECF 1-5. This is significant, Jordan

contends, because Licensed Engineer Officers had "long been entitled to participate in the Plan as

part of their economic package." ECF 1, ¶ 25.

Jordan also points to two other documents that he claims "confirm[]" that "the Merger

Agreement amended multiple MEBA-affiliated, ERISA governed plans for incoming UMOA

members." *Id*. ¶ 30. One is a memorandum of November 9, 1992, from Joel E. Bem, MEBA's

Secretary-Treasurer, to MEBA Licensed Deck Officers concerning MEBA's Vacation Dues, under

a separate plan for MEBA members. *Id*. Bem noted that "MEBA members are obligated to pay

vacation dues under the By-laws of our organization and in the case of former UMOA members,

under the terms of the merger agreement. The merger agreement specifically calls for [certain

vacation dues]." *Id*.; ECF 1-6.

The other document is a letter of November 25, 1992, from Ristine to "All Licensed Deck

Officers," also about vacation issues. Ristine stated that "vacation payments to Licensed Deck

Officers are payable in accordance with the terms of the Merger Agreement." ECF 1, ¶ 30; ECF

1-7.

In July 2019, Jordan appealed the Plan's denial of pension credits to the Plan's Board. ECF

1, ¶ 32. In a letter dated November 1, 2019 (ECF 1-8), the Plan notified Jordan that his appeal

was denied. ECF 1, ¶ 33; ECF 1-8. [6]

---

[6] Paragraph 33 of the Complaint asserts that the letter is dated "November 1, 2020," but
the reference to 2020 appears to be a typographical error. The letter, as shown in the exhibit, is
dated November 1, 2019. ECF 1-8 at 1. Moreover, a footnote in the Complaint explains that the
letter was "purportedly mailed November 1, 2019," but that Jordan did not receive it until
December 18, 2019. ECF 1 at 12 n.4. In communications between counsel for Jordan and the
Plan in February 2020, the Plan "agreed that the statute of limitations would run from the date
Captain Jordan received the letter," *i.e.*, December 18, 2019. *Id.*

The Plan's denial letter "did not specifically address Captain Jordan's appeal regarding his entitlement to additional years of pension credit based on the Merger Agreement. Rather, the Plan issued a blanket denial of Captain Jordan's appeal on the supposed basis that to award additional pension credits for past service 'would require amendment to the Plan's Rules and Regulations.'" ECF 1, ¶ 33 (quoting ECF 1-8 at 2).  In making their determination, the Trustees considered a memorandum of October 25, 2019, from the Plan administrator; "all documents contained in the three-ring binder [Jordan] submitted to the Plan Office;" the Service Contract Act (for unrelated issues); and the Regulations.  ECF 1-8 at 1.  The letter also advised that it represented the "final determination" of the Board regarding the appeal and "the termination of the claims and appeals procedure to which [Jordan is] entitled under the Plan."  *Id*. at 2.  And, it noted that Jordan had a right to bring an appeal under ERISA if he still disagreed with the decision.  *Id*.

Plaintiff's "Complaint For Money Damages, Declaratory And Injunctive Relief" followed on December 17, 2020.  ECF 1.  Additional facts are included, *infra*.

## II.      Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Id*. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff."  *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017);

*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  But, a court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

A plaintiff may not cure a defect in a complaint, or otherwise amend a complaint, by way of an opposition to a Rule 12(b)(6) motion.  *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274 at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'" (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984))), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting

*Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'"  *Goodman*, 494 F.3d at 464 (quoting Forst, 4 F.3d at 250) (emphasis added in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007).  But, a court may properly consider documents expressly incorporated by reference into the complaint.  *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citing *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Six v. Generations Federal Credit Union*, 891 F.3d 508, 512 (2018); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also consider documents submitted by the movant, even if they were not attached to or expressly incorporated in a complaint. However, the document must be "integral to the complaint" and there can be "no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips*, 572 F.3d at 180. Pursuant to Fed. R. Evid. 201, a court may

take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And, courts may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment. *See, e.g.*, *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

As noted, Jordan attached a series of documents to the Complaint. These include the UMOA Contract Fact Sheet (ECF 1-3); communications from W.I. Ristine (ECF 1-4; ECF 1-5); the letters of Joel Bem and W.I. Ristine regarding vacation dues (ECF 1-6; ECF 1-7); and the Board's denial of Jordan's benefits request (ECF 1-8). Because these submissions are exhibits to the Complaint, I may consider them in evaluating the Motion.

The Plan also submitted a number of documents as exhibits to its Motion. These include a copy of the current Regulations (ECF 13-2); a copy of the Regulations as of January 1, 1990 (ECF 13-3); a copy of the Regulations as of July 1, 1990 (ECF 13-4); a copy of the current version of the SPD (ECF 13-5); a copy of the SPD in effect in 1990 (ECF 13-6); a copy of the current version of the Trust Agreement (ECF 13-7); and a copy of the Trust Agreement as of October 17, 1990 (ECF 13-8).

"[A] court may properly consider ERISA plan documents on a motion to dismiss." *Hooker v. Tunnell Gov't Servs.*, 447 F. Supp. 3d 384, 390 (D. Md. 2020) (citing *Clark v. BASF Corp.*, 142 F. App'x 659, 661 (4th Cir. 2005)). Moreover, the Regulations and the SPD are explicitly referenced in the Complaint and are central to Jordan's claims. *See* ECF 1, ¶¶ 7, 29, p. 13.

Although Jordan does not explicitly reference the Trust Agreement in the Complaint,[7] the Trust Agreement is also one of the Plan's governing documents, and thus integral to Jordan's claims. In any event, Jordan does not dispute the authenticity of any of these documents. To the contrary, he agrees they may be considered and cites them repeatedly in his Opposition. ECF 16 at 8 n.3; 10-13, 22-23, 29-30.

Jordan attached to his Opposition a copy of the "By-Laws of the District No. 1 – PCD Marine Engineers' Beneficial Association AFL-CIO." ECF 16-1. The exhibit provides necessary context to the Trust Agreement and Regulations. Moreover, defendant does not object to consideration of the By-Laws. *See* ECF 18.

Accordingly, in evaluating the Motion, I may consider the documents submitted by the parties.

### III.    ERISA and the Plan

### A.  General Principles

ERISA was "enacted to protect the interests of participants in employee benefit plans and their beneficiaries . . . ." *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003); *see United McGill Corp. v. Stinnett,* 154 F.3d 168, 172 (4th Cir. 1998) (stating that a primary purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans"); 29 U.S.C. § 1001(b). It does so, *inter alia*, by setting "'various uniform standards [for employee benefit plans], including rules concerning reporting, disclosure, and fiduciary responsibility.'" *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 190 (4th Cir. 2007) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983)).

---

[7] As mentioned, Jordan is not consistent as to whether the term "Plan Document" includes the Trust Agreement.

Under ERISA, "[e]very employee benefit plan" must be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), "specify[ing] the basis on which payments are made to and from the plan." *Id.* § 1102(b)(4). The Plan must be administered "in accordance with the documents and instruments governing the plan . . . ." *Id.* § 1104(a)(1)(D); *see Kennedy v. Plan Administrator For DuPont Savings and Investment Plan*, 555 U.S. 285, 300 (2009).

The Supreme Court underscored in *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013): "'The plan, in short, is at the center of ERISA'. . . [O]nce a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.' . . . This focus on the written terms of the plan is the linchpin of 'a system that is [not] so complex that administrative costs, or litigation expense, unduly discourage employers from offering [ERISA] plans in the first place.'" (Citations omitted; alterations in *Heimeshoff*); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (recognizing that ERISA's statutory scheme "is built around reliance on the face of written plan documents"); *Boyd v. Metro. Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011) (recognizing that "plan administrators must act 'in accordance with the documents and instruments governing the plan . . .'") (citation omitted).

ERISA requires a "summary plan description" ("SPD") of an employee benefit plan to be furnished to participants and beneficiaries. 29 U.S.C. § 1022(a). The SPD must be "written in a manner calculated to be understood by the average plan participant, and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* Although SPDs "provide communication with beneficiaries *about*

16

the plan," the statements in an SPD "do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original).

"ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co*., 77 F.3d 84, 88 (4th Cir. 1996). In general, entitlement to benefits "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire and Rubber Co. v. Burch,* 489 U.S. 101, 115 (1989); *see, e.g.*, *Johnson v. American United Life Ins. Co.*, 716 F.3d 813, 819–21 (4th Cir. 2013) (examining language of ERISA insurance policy provision to determine plan participant's eligibility).

Notably, "'[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *US Airways, Inc. v. McCutchen,* 569 U.S. 88, 102 (2013) (quoting *Firestone Tire*, 489 U.S. at 113). Thus, "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005) (internal quotation marks omitted), *aff'd,* 547 U.S. 356 (2006). As the Supreme Court said in *McCutchen,* 569 U.S. at 100, ERISA's "statutory scheme . . . is built around reliance on the face of written plan documents." (Internal quotation marks omitted).

As indicated, principles of contract law require that federal courts enforce "the plan's plain language in its ordinary sense." *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir.1996) (internal quotation marks and citations omitted). Therefore, courts must determine the ordinary meaning of terms "as a reasonable person in the position of the plan participant would have understood the words." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 1995) (internal citations omitted).

"ERISA plans, like contracts, are to be construed as a whole." *Id.*   Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir.1993).  And, "a court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993).

If the terms of a contract are unambiguous, the court may interpret the contract as a matter of law. *World–Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir.1992). However, in the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F.Supp.2d 378, 394 (D. Md. 2011) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir.1972)); *see Bliss v. National Union Fire Ins. Co. of Pittsburgh, PA*, 132 F. Supp. 3d 676, 679-80 (D. Md. 2015) (noting that ordinary principles of contract law apply to ERISA and granting a motion to dismiss due to lack of ambiguity); *Perkins v. U.S. Airways, Inc.*, No. 6:14-cv-2577, 2015 WL 5783561, at *5 (D. S.C. Sept. 30, 2015) (dismissing a claim after finding no ambiguity in ERISA plan "construed as a whole"); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F.Supp.2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

As to the statute, courts "'must enforce plain and unambiguous statutory language in ERISA,' as in any statute, 'according to its terms.'"  *Intel Corp. Investment Policy Committee v. Sulyma*, ___ U.S. ___, 140 S. Ct. 768, 776 (2020) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)).  Since its inception in 1974, ERISA has defined "employee pension benefit plan" and "pension plan" to refer to any type of plan or program that "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment."  29 U.S.C. § 1002(2)(A).

## B.  ERISA Causes of Action

ERISA establishes a series of causes of action to enforce its provisions, the rights of plan beneficiaries, and for other purposes.  These are primarily laid out in ERISA § 502(a), codified at 29 U.S.C. § 1132(a).

Three causes of action are relevant to this case: a claim for wrongful denial of benefits under § 502(a)(1)(B); a claim for breach of fiduciary duty on behalf of a plan under § 502(a)(2); and a claim for equitable relief under § 503(a)(3).  "[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling."  *McWilliams v. Metropolitan Life Ins. Co.*, 172 F.3d 863, 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999) (unpublished table decision) (citing *Bolton v. Construction Laborers Pension Trust*, 56 F.3d 1055, 1058 (9th Cir.1995)).

### 1.  ERISA § 502(a)(1)(B)

Under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), "a plan participant may bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the

plan.'" *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).

Ordinarily, "a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115; *see Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Woods v. Prudential Ins. Co. of America*, 528 F.3d 320, 322 (4th Cir. 2008). When the Plan vests the administrator with discretionary authority to determine eligibility, the administrator's decision is reviewed for abuse of discretion. *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

As a threshold matter, the Court must determine, *de novo*, whether a plan's "provision for benefits is prescriptive or discretionary. . . ." *See Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000). "'If the plan [does] not give the employer or administrator discretionary or final authority to construe uncertain terms,'" the court looks to "'the terms of the plan and other manifestations of the parties' intent.'" *Id.* at 340-41 (alteration in *Booth*) (quoting *Firestone Tire*, 489 U.S. at 112-13). And, "'[w]here discretion is conferred upon the trustee with respect to the exercise of a power,'" the court on review must determine whether there was "'an abuse by the trustee of his discretion.'" *Booth*, 201 F.3d at 341 (quoting *Firestone Tire*, 489 U.S. at 111).

If the plan confers discretion on the administrator, the court does "not disturb a plan administrator's decision if the decision is reasonable," even if the court would have reached "a contrary conclusion. . . ." *Williams*, 609 F.3d at 630. Of import, a decision of the administrator is reasonable if it results from a "'deliberate, principled reasoning process' and [is] supported by

substantial evidence." *Id.* (citation omitted).  The standard "requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).  In other words, the court should not "disturb such a decision if it is reasonable." *Booth*, 201 F.3d at 342.  Nor may the court substitute its own judgment for that of the administrator. *Williams*, 609 F.3d at 630.

In *Booth*, 201 F.3d at 342-43, the Fourth Circuit outlined eight factors to consider in evaluating the reasonableness of a benefit decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Notably, the application of the abuse of discretion standard limits the evidence a court may consider in reviewing the plan administrator's decision.  "Generally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." *Helton v. AT&T, Inc.*, 709 F.3d 343, 353–54 (4th Cir. 2013) (citing *Sheppard & Enoch Pratt Hospital, Inc. v. Travelers Ins.* Co., 32 F.3d 120, 125 (4th Cir. 1994)). But, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the [*Booth* abuse of discretion] factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Helton*, 709 F.3d at 356.  Otherwise, the federal courts "would have effectively surrendered [their] ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that

21

would suggest their decisions were unreasonable." *Id.* at 353.  And, under the principles of agency law, "an ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records." *Id.* at 356.

## 2.  ERISA § 502(a)(2)

Under ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), "[a] civil action may be brought--by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  The statute provides, 29 U.S.C. § 1109(a), ERISA § 409:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

In *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371 (4th Cir. 2001), the Fourth Circuit examined the nature of the duties imposed on plan fiduciaries under ERISA. It explained, *id.* at 380 (some internal citations omitted):

> Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts. Under common law trust principles, a fiduciary has an unyielding duty of loyalty to the beneficiary. Naturally, such a duty of loyalty precludes a fiduciary from making material misrepresentations to the beneficiary. However, a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary. ERISA administrators have a fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000) (internal quotation marks omitted), *cert. denied*, 531 U.S. 1037 (2000).
>
> Moreover, a fiduciary is at times obligated to affirmatively provide information to the beneficiary. Indeed, "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 750 (D.C.Cir. 1990). The common law of trusts identifies two instances where a trustee is under a "duty to inform." First, a fiduciary has "a duty to give beneficiaries upon request 'complete and accurate information as to the nature and

amount of the trust property.'" *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir.1996) (quoting Restatement (Second) of Trusts § 173 (1959)). Second, in limited circumstances, a trustee is required to provide information to the beneficiary even when there has been no specific request:

> "Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information.... [However,] he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection...."

Restatement (Second) of Trusts § 173 cmt. d. In sum, the duty to inform "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler* [*v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d [1292,] 1300 [ (3d Cir.1993)].

To assert "'a claim for breach of fiduciary duty under ERISA, [a] plaintiff must allege: (1) that the defendant was a fiduciary, (2) who was acting within his fiduciary capacity, and (3) breached his duty.'" *Guardian Life Ins. Co. of America v. Reinaman*, WDQ-10-1374, 2011 WL 2133703, at *7 (D. Md. May 28, 2011) (quoting *Cuthie v. Fleet Reserve Ass'n*, 743 F. Supp. 2d 486, 494 (D. Md. 2010)); *see Adams v. Brink's Co.*, 261 F. App'x 583, 590 (4th Cir. 2008).

Although an individual may bring a claim using § 502(a)(2), only the plan as a whole, and not an individual beneficiary, is entitled to relief under this section of ERISA. *Mass. Mut Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985); *see also LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 (2008); *David v. Alphin*, 704 F.3d 327, 332 (4th Cir. 2013). A claim for individual relief under § 502(a)(2) is impermissible because "§ 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries." *LaRue*, 552 U.S. at 256; *see Russell*, 473 U.S. at 140.

### 3.   ERISA § 502(a)(3)

Section § 502(a)(3) of ERISA, codified at 29 U.S.C. § 1132(a)(3), serves as a "catchall," offering "appropriate equitable relief for injuries caused by violations that § 502 does not

elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).  It provides, 29 U.S.C. § 1132(a)(3):

> (a)  Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> \*   \*   \*
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

To establish a violation of § 502(a)(3), a plaintiff must show a violation of an ERISA provision, and that the relief sought constitutes "appropriate equitable relief."  *See Pender v. Bank of Am. Corp.*, 788 F.3d 354, 363-64 (4th Cir. 2015).  "The Supreme Court has interpreted the term 'appropriate equitable relief,' as used in Section 502(a)(3), to refer to 'those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity.'"  *Id.* at 364 (emphasis in original) (quoting *Amara*, 563 U.S. at 439).  However, relief under § 502(a)(3) is available only if a plaintiff's relief under ERISA's other remedial provisions would otherwise be inadequate.  *See Varity Corp.*, 516 U.S. at 512; *Korotynska*, 474 F.3d at 105.

The law is clear that a plaintiff may not simply claim denial of benefits under § 502(a)(1)(B), then "repackage" that claim as one for breach of fiduciary duty under § 502(a)(3). *Varity*, 516 U.S. at 513-15.  However, where a plaintiff's remedy would be inadequate under § 502(a)(1)(B), that plaintiff is also entitled to seek simultaneous relief under § 502(a)(3).  The paradigmatic case is one in which a plaintiff seeks individualized relief, but is no longer a member of the plan.  *See Varity*, 516 U.S. at 515.

As noted, in reviewing claims under § 502(a)(3), the Supreme Court and the Fourth Circuit have "concluded that the provision creates a 'catchall' which 'act[s] as a safety net, offering

appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy.'" *Korotynska*, 474 F.3d at 105 (alterations in original) (quoting *Varity*, 516 U.S. at 512). Further, "§ 1132(a)(3) authorizes some individualized claims for breach of fiduciary duty, but not where the plaintiff's injury finds adequate relief in another part of ERISA's statutory scheme." *Korotynska*, 474 F.3d at 105 (citing *Varity*, 516 U.S. at 512, 515). "The question under *Varity*, then, is whether the claimant's injury is addressed by ERISA's other provisions and whether those provisions afford adequate relief. If so, equitable relief under § 1132(a)(3) will normally not be 'appropriate.'" *Korotynska*, 474 F.3d at 105 (quoting *Varity*, 516 U.S. at 515).

### C. Amending an ERISA Plan

The law relating to the amendment of an ERISA plan is of importance in this case. Under ERISA, "[e]very employee benefit plan" must be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), "specify[ing] the basis on which payments are made to and from the plan." *Id.* § 1102(b)(4). Furthermore, "[e]very employee benefit plan shall . . . provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." *Id.* § 1102(b)(3). A plan fiduciary must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan." *Id.* § 1104(a)(1)(D).

As noted, the Supreme Court underscored in *Heimeshoff*, 571 U.S. at 108 (citations omitted; alterations in *Heimeshoff*): "'The plan, in short, is at the center of ERISA'. . . [O]nce a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument. . . .'" The Court added, *id.*: "[W]e have recognized the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims." *See McCutchen*, 569 U.S. at 100; *see also Curtiss-Wright Corp.*, 514 U.S. at 83 (recognizing that ERISA's statutory scheme "is built

around reliance on the face of written plan documents"); *Boyd*, 636 F.3d at 140 (recognizing that "plan administrators must act 'in accordance with the documents and instruments governing the plan . . .'" (citation omitted)).

"ERISA . . . follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Curtiss-Wright Corp.*, 514 U.S. at 85 (upholding a minimalist amendment provision that simply read, "The Company reserves the right at any time to amend the plan."). Notably, "informal and unauthorized amendment[s are] . . . as a matter of law . . . impermissible." *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir. 1989). Thus, "oral and informal amendments to established ERISA plans are completely incapable of altering the specified terms of the plan's written coverage." *HealthSouth Rehabilitation Hosp. v. American Nat. Red Cross*, 101 F.3d 1005, 1009 (4th Cir. 1996); *see also Coleman*, 969 F.2d at 58-59 ("[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing. Oral or informal written modifications to a plan . . . are of no effect." ); *Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 295 (4th Cir. 1993) ("Oral or informal written amendments are inadequate to alter the written terms of a plan, as this practice would undermine certainty.").

Because ERISA "places great emphasis upon adherence to the written provisions in an employee benefit plan," a "court should be hesitant to depart from the written terms of a contract . . . ." *Coleman* 969 F.2d at 56; *see McCutchen*, 569 U.S. at 100–01 (ERISA's "statutory scheme, we have often noted, is built around reliance on the face of written plan documents." (internal quotation marks omitted)). But, if the plan's amendment procedure vests amendment power in the company, an unauthorized amendment that is subsequently ratified by the company under corporate law principles may be upheld. *Curtiss-Wright Corp.*, 514 U.S. at 85.

To constitute an amendment, a plan amendment need not be labelled as an "amendment." *See, e.g.*, *Minerley v. Aetna*, 801 F. App'x 861, 864-65 (2020) (HMO policy); *Halliburton Co. Benefits Committee v. Graves*, 463 F.3d 360, 371-74 (5th Cir. 2006) ("'[A]ny act that is directed to a provision of an ERISA plan may be deemed to constitute a plan amendment even though it does not recite that it is intended to amend the plan and it is not included in a plan document.'" (quoting JOHN F. BUCKLEY, ERISA LAW ANSWER BOOK –7 (5th ed.2006))); *Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125, 127-28 (9th Cir. 1991) (amendment by board resolutions); *In re U.S. Airways, Inc.*, No. 04-13819-SSM, 2007 WL 2416536, at *5 (Bankr. E.D. Va. Aug. 20, 2007) (citing *Horn*, 938 F.2d at 127); *Normann v. Amphenol Corp.*, 956 F. Supp. 158, 162-63 (N.D.N.Y. 1997) (amendment by board resolutions). But, any such amendment must still be adopted in writing and via the plan's formal amendment procedures. *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861 (4th Cir. 1994); *Coleman*, 969 F.2d at 58-59.

Of relevance here, "[s]ome courts have allowed employees to recover promised benefits that are not contained in a formal written plan document if the benefits are contained in an informal benefit plan." *Elmore*, 23 F.3d at 861. Such an "informal" ERISA plan exists only when "'a reasonable person'" is able to "'ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.'" *Id.* (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982)). However, such a plan cannot exist if "the formal plan contains [an integration clause] which excludes the possibility of an informal plan." *Wheeler v. Westmoreland Retirement Plan*, 182 F.3d 912, 912 (4th Cir.1999).

### D.  The Plan

Jordan's claim  apparently was denied in 2019. Yet, the Regulations attached to the Motion were amended in 2020. ECF 13-2 at 1. (The Trust Agreement was last amended in 1996.  ECF

27

13-7 at 1.)  Thus, it is not clear if the Regulations submitted as an exhibit are applicable.  In any event, they illustrate the general contours of the Plan, and are helpful in resolving the parties' arguments related to the possible effect of the Merger Agreement.

The Trust Agreement (ECF 13-7) "establishe[s] and continue[s] the MEBA Pension Fund to be used for administering and operating the MEBA Pension Plan and the MEBA 401(k) Plan." *Id.* § 2.1.  It defines the Plan as "the employee pension benefit plan established and maintained pursuant to this Agreement and the [Regulations]." *Id*. § 1.10.  "It is . . . intended," per the Trust Agreement, that the "Trust and Subfund hereunder shall be established and operated in a manner that complies with ERISA, as it presently exists and as it may hereafter be amended. To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust and each Subfund hereunder while continuing to comply with the requirements of ERISA." *Id*. § 2.4.

The Trustees are granted substantial discretionary authority to interpret and administer the Plan, including as to eligibility and benefits.  The Trust Agreement provides, *id.* § 4.4:

4.4 Interpretation.

The Trustees shall have complete authority, in their sole and absolute discretion, to (i) interpret the terms of the Trust, the Plan, any insurance contracts or policies (and any related documents and underlying policies) and (ii) determine eligibility for, and the amount of, benefits under the Plan. All such interpretations and determinations of the Trustees shall be final and binding upon all parties and persons affected thereby.

Similarly, the Regulations (ECF 13-2) provide, *id.* § 12:04(a):

12.04 Plan Interpretation and Benefit Determination

(a) The Trustees shall have complete authority, in their sole and absolute discretion, to interpret the terms of the Trust, the Plan, the Regulations, any insurance contracts or policies, and any related documents and underlying policies; to determine eligibility for, and the amount of, benefits under the Plan; and to make factual determinations, correct defects, supply omissions and reconcile inconsistencies to

28

the extent necessary to effectuate the Plan. All such interpretations and determinations of the Trustees shall be final and binding upon all parties and persons affected thereby.

As discussed, under the Plan, employees earn pension credit based upon days of "Covered Employment" for a participating employer. *See* ECF 13-5 at 6-8; ECF 13-6 at 5-9. "Covered Employment" means, primarily, "employment for which the Employer is obligated to contribute to the MEBA Pension Trust for benefits under the Plan on behalf of an Employee." ECF 13-2, § 1.12(a). Participating employers are obligated to make contributions to the Plan on behalf of their employees for the periods of Covered Employment. *See* ECF 13-7, § 2.2 ("Each Employer shall pay to the Trustees for deposit in the Pension Trust and allocation to the Pension Subfund, for each Employee represented by the Union for the purpose of collective bargaining, such sum per day per man on Employer payroll or such percentage of such Employee's straight time earnings plus the non-watchstanding equivalent . . . as shall be determined necessary to qualify the Pension Plan and Pension Trust under then existing laws and regulations."); *see also* ECF 13-5 at 5; ECF 13-6 at 6. Years of pension credit are used to determine the amount of pension benefit, and when it can be received. *See* ECF 13-5 at 9-16; ECF 13-6 at 1-5.

General authority for the administration of the Plan is vested in a Board of Trustees. ECF 13-7, §§ 3.1, 4.12; *see also* ECF 13-2, § 1.30 (defining the Trustees as the "Plan Administrator," subject to delegation). There are twelve Trustees, six of whom are appointed by MEBA and six of whom are appointed by participating employers. ECF 13-7, § 3.1. The largest participating employers, as determined by "cumulative man days," have the right to name the employer Trustees. *Id*. § 3.2.

MEBA Trustees, meanwhile, are appointed by the MEBA District Executive Committee. *Id*. § 3.4. The Trust Agreement also imposes certain procedural obligations on the Trustees.

Meetings of the Trustees are held at such places as are determined by the Trustees' Chairman and Secretary. *Id*. § 5.1. Meetings must be called with five days' written notice, but this may be waived by unanimous consent. *Id*. Meetings require a quorum of at least four Trustees, two of whom must be from the employers and two of whom must be from MEBA. *Id*. § 5.2. "The Trustees shall keep full minutes of all their meetings, resolutions, and actions." *Id*. § 5.4. Finally, "[i]ndividual members of the Board of Trustees may not take any action for or on behalf of the Trustees between meetings, except as may be specifically authorized." *Id*. § 5.1.

The amendment procedures specified in the Trust Agreement and Regulations are crucial in this case. I examine these provisions with reference to the 1990 version of both documents, which would have been in effect at the time of the Merger Agreement.

The Trust Agreement and Regulations both granted broad, and largely exclusive, power to the Trustees to amend either document. The Trust Agreement provided, in relevant part, ECF 13-8, § 8.8:

> 8.6 <u>Amendment and Termination of Trust.</u>
>
> (a) <u>Amendment.</u> Notwithstanding any provision of this Agreement to the contrary, this Agreement and the Regulations hereunder may be amended, at any time and in any manner by the Trustees, in their sole and absolute discretion, provided that no amendment by the Trustees will be valid if it results in any increase in the cost of the benefit program prevailing prior to such amendment, unless the participating Employers and the Association [meaning MEBA] consent to such Amendment.

Similarly, the Regulations provided, ECF 13-3, § 11.02 (January 1, 1990 Regulations):

> 11.02 <u>Amendment.</u>
>
> The Trustees may amend or modify these Regulations at any time in accordance with the MEBA Pension Trust and [the trust agreement for the MEBA Medical Plan], including, but not limited to, any change in benefit amount, types of benefit, and conditions of eligibility and payment, provided that no amendment or modification may reduce any benefit rights which may have accrued prior to amendment, so long as Plan assets are available for payment of such benefits.

*See also* ECF 13-4, § 11.02 (substantively identical provision in July 1, 1990

Regulations).

In another provision, however, the Trust Agreement contemplated the possibility of

revision via a procedure involving the union and the employers.  Specifically, Section 4.1 of the

1990 Trust Agreement provided, ECF 13-8, § 4.1 (emphasis added):

> 4.1 <u>Benefits.</u>
>
> The existing benefits and eligibility rules in effect shall continue in effect, except as the Pension Trust Regulations may be hereafter modified *by agreement between the Association [meaning MEBA] and the participating Employers* or by the Trustees hereof provided that no unilateral action by the Trustees will be valid if it results in any increase in the cost of the benefit program prevailing prior to any such change.  The detailed basis of eligibility for benefits, types and forms of benefits payable and payment of benefits to (or on behalf of) Participants shall be specified in the rules and regulations comprising the Plan.
>
> The implications of these amendment procedures are discussed, *infra*.

## IV.   Discussion

In its Motion, the Plan advances several contentions to support its position that dismissal

is appropriate.  The Plan maintains that UMOA and MBEA, the two non-party unions, did not

amend the "Plan Document" to create the entitlement allegedly owed to Jordan because, as parties

to the Merger Agreement, UMOA and MBEA did not have authority to amend the Plan.  Rather,

only the Plan's Trustees are empowered to do so.  ECF 13-1 at 3, 14-18.  Further, the Plan asserts

that although Jordan has brought a claim for breach of fiduciary duty, he cannot obtain

"individualized monetary damages" under such a claim.  *Id.* at 3; *see id.* at 19-23.  The Plan also

contends that, even if Jordan has attempted to plead a denial of benefits claim, he has cited no

provisions of the Plan's governing documents entitling him to the asserted benefit, and that

discovery would not be available in any case.  *Id*. at 22-23, 28-31.  In addition, the Plan argues that

Jordan cannot rely on the statements he cites in his Complaint.  *Id*. at 25-28.

### A.  Plaintiff's Claim

The parties disagree as to the precise nature of Jordan's claim.  The Plan argues that Jordan has presented a claim for breach of fiduciary duty, but that he has failed to specify whether he is pleading a § 502(a)(2) claim or a § 502(a)(3) claim.  ECF 13-1 at 18-25.  According to the Plan, under either interpretation, Jordan does not satisfy the relevant requirements.

In particular, the Plan notes that Jordan is plainly seeking individual declaratory, injunctive, and monetary relief, but that only a plan as a whole is entitled to relief under a § 502(a)(2) claim. *Id.* at 20-21.  As for § 502(a)(3), the Plan argues that a § 502(a)(3) claim is unavailable because § 502(a)(1)(B) already provides an adequate remedy, as § 502(a)(3) only provides a remedy when ERISA's other provisions are inadequate.  *Id.* at 21-23.  The Plan also notes that Jordan seeks monetary relief, yet § 502(a)(3) authorizes only equitable relief.  *Id.* at 24-25.

In response, Jordan maintains that he is not pleading a fiduciary duty claim at all, either under § 502(a)(2) or § 502(a)(3), but rather a wrongful denial of benefits claim under § 502(a)(1)(B).  ECF 16 at 18-19.  He asserts, *id.*: "To clear up any lingering confusion, Plaintiff hereby confirms that he is *not* bringing a claim for breach of fiduciary duty under subsections (a)(2) or (a)(3) of § 1132" (emphasis in original).[8]  Thus, Jordan urges the Court to "ignore Defendant's irrelevant arguments" as to § 502(a)(2) and § 502(a)(3)."  *Id.*  The Plan responds that Jordan's Complaint clearly made out a fiduciary duty claim, and that his argument constitutes an impermissible attempt to amend a complaint via an opposition to a motion to dismiss.  ECF 18 at 3-5.

---

[8] Plaintiff seems to overlook that he expressly asserted in ECF 1, ¶ 38 that the Plan violated 29 U.S.C. § 1104(a)(1)(D), which relates to fiduciary duties.

To be sure, "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy." *Walk at Broadlands Homeowner's Ass'n,* 713 F.3d at 184. The Plan focuses on a paragraph in Count I of the Complaint that reads as follows: "By wrongfully denying Plaintiff Plan pension credit due to him in accordance with the 1990 Merger Agreement between UMOA and MEBA, the Plan has failed to act in compliance with the language of the documents and the instruments governing the Plan in violation of ERISA, 29 U.S.C. §§ 1132(a), and 1104(a)(1)(D)." ECF 1, ¶ 38.

Section 1132(a) corresponds to § 502(a), which includes all of the causes of action discussed above. And, § 1104(a)(1)(D) imposes a fiduciary duty to act "in accordance with the documents and instruments governing the plan." The Plan argues that this reference to a "violation" of § 1104 indicates that Jordan is attempting to assert a claim for breach of fiduciary duty.

The precise contours of the claim certainly could be clearer. To be sure, Jordan never mentions the assertion of a claim under § 502(a)(1)(B), § 502(a)(2), or § 502(a)(3). But, the Plan has read Jordan's claim too narrowly. The first paragraph of the Complaint announces: "This is an action brought by a participant in a pension benefit plan governed by [ERISA] against the plan to require it to pay and accrue pension credits based on past service which have been *wrongfully denied* to Plaintiff." ECF 1, ¶ 1 (emphasis added). Further, the Complaint states: "Captain Jordan brings this action against the Plan based on its *wrongful denial* of twelve years of past pension credit due to him under the Plan Document," *id*. ¶ 8 (emphasis added), and labels an entire section, "The Plan Wrongfully Denies Plaintiff Pension Credits." *Id*. at 9.

And, in paragraph 38, Jordan explicitly alleges that the Plan has "wrongfully den[ied] Plaintiff Plan credit due to him . . . ." *Id.* The two paragraphs that follow allege that "Plaintiff

has accrued pension benefits and service credits that the defendant Plan has refused to recognize," *id*. ¶ 39, and the Plan has "refus[ed] to acknowledge and abide by the terms of the Merger Agreement." *Id*. ¶ 40. Thereafter, the Complaint seeks, *inter alia*, "[a] judgment declaring that . . . [t]he Defendant Plan is obligated to . . . grant 12 years of additional service credit to Plaintiff" and "[a] judgment awarding Plaintiff retroactive pension credit from 1984 through 1995." *Id*. at 13-14.

Taken together, and in the light most favorable to Jordan, the Complaint lodges a claim "to recover benefits due to [Jordan] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *See* 29 U.S.C. § 1102(a)(1)(B) (corresponding to ERISA § 502(a)(1)(B)). This is the category of claim often referred to as "wrongful denial of benefits." *See, e.g.*, *Korotynska*, 474 F.3d at 106 ("wrongful denial of benefits"); *Booth*, 201 F.3d at 338 ("wrongfully denied benefits"); *Sedlack v. Braswell Servs. Grp.*, 134 F.3d 219, 221 (4th Cir. 1998) ("wrongful denial of benefits"); *Frank v. Liberty Life Assurance Co. of Boston*, 149 F. Supp. 3d 566, 568 (D. Md. 2015) ("wrongful denial of benefits"); *Kane v. UPS Pension Plan Bd. of Trustees*, RDB-11-3719, 2012 WL 5869307, at *3 (D. Md. Nov. 19, 2012) ("wrongful denial of benefits").

That plaintiff referenced § 1104 in paragraph 38 of the Complaint is of no moment, given what was expressly stated. After all, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *City of Shelby,* 574 U.S. at 11. The Complaint's language, particularly its repeated use of the phrase "wrongful denial of benefits," makes clear that Jordan is pursuing a § 502(a)(1)(B) claim.

Accordingly, I need not consider the Plan's arguments as to fiduciary duty claims. *See* ECF 13-1 at 18-25. Instead, I address the arguments made in the Motion as to the effect of the

Merger Agreement, the alleged failure to cite a governing document, and the question of the availability of discovery.

The fact that Jordan has brought a § 502(a)(1)(B) claim has certain implications.  As discussed above, § 502(a)(1)(B) claims are reviewed under an abuse of discretion standard when the plan grants the administrator or other fiduciary discretion in making the determination.  *See Booth*, 201 F.3d at 341 ("'Where discretion is conferred upon the trustee with respect to the exercise of a power,'" a plaintiff must prove that there was "'an abuse by the trustee of his discretion.'" (quoting *Firestone*, 289 U.S. at 111)).  Here, the Trust Agreement grants the Trustees "complete authority, in their sole and absolute discretion, to (i) interpret the terms of the Trust, the Plan, any insurance contracts or policies (and any related documents and underlying policies) and (ii) determine eligibility for, and the amount of, benefits under the Plan." ECF 13-7, § 4.4.

Similarly, the Regulations grant the Trustees "complete authority, in their sole and absolute discretion, to interpret the terms of the Trust, the Plan, the Regulations, any insurance contracts or policies, and any related documents and underlying policies; to determine eligibility for, and the amount of, benefits under the Plan; and to make factual determinations, correct defects, supply omissions and reconcile inconsistencies to the extent necessary to effectuate the Plan." ECF 13-2, § 12.04.

This language more than suffices to confer discretion on the Trustees.  *See, e.g.*, *Helton*, 709 F.3d at 351 (finding discretion where the plan stated that the benefits committee "shall have sole and complete discretionary authority and control to manage the operation and administration of the Plan, including, but not limited to . . . interpretation of all Plan provisions [and] determination of the amount and kind of benefits payable to any Participant . . . ."); *Booth*, 201 F.3d at 343 (finding discretion where the terms of the plan gave the administrative committee

"complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, and supply omissions"). Therefore, at this stage, Jordan must make factual claims sufficient to plausibly allege that the Trustees abused their discretion in their determination to deny Jordan pension credit for the periods at issue. In addition, the abuse of discretion standard presents limitations on the record I may consider in reviewing the Trustees' determination.

## B. The Merger Agreement

Jordan alleges that, "[o]n information and belief, the Merger Agreement was intended to, and did in fact, amend the Plan Document." ECF 1, ¶ 8.[9] If the Merger Agreement did, in fact, amend the Regulations to create the entitlement Jordan alleges he is owed, then Jordan's case is strong. But, if the Regulations were never amended to create any such entitlement, then Jordan's case is considerably weaker.

In his Complaint, Jordan asserts that he has not been able to obtain a copy of the Merger Agreement, but he "is confident that the factual contentions regarding the language of the Merger Agreement will have ample evidentiary support after a reasonable opportunity for further investigation and discovery." *Id*. ¶ 29. He bases this claim on four major buckets of allegations, already described: the pre-merger communications from Rick Morrill; MEBA documents related to the merger; communications from W.I. Ristine; and other documents suggesting that the Merger Agreement altered the MEBA Vacation Plan. *Id*. ¶¶ 21-30.

The Plan insists that it is "inherently implausible" that the Merger Agreement amended the Plan, and therefore Jordan's claim must be dismissed. ECF 13-1 at 14; *cf. Twombly*, 550 U.S. at

---

[9] As noted, in the Complaint plaintiff characterized the Trust Regulations as the Plan Document. ECF 1, ¶ 7. In his Opposition, he includes the Trust Agreement as a Plan document. ECF 16 at 10 n.7. The Plan provided the Plan documents with its Motion. Ultimately, and at the appropriate time, it is for the Court to determine which documents constitute and govern the Plan.

570 (to survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."). This is so, the Plan says, for a simple reason: MEBA and UMOA agreed to the Merger Agreement. *See* ECF 1, ¶ 8; ECF 13-1 at 14-15. But, under the terms of the Trust Agreement and the Regulations, only the Trustees are authorized to amend these documents. ECF 13-1 at 14-18; *see* ECF 13-8, § 8.8 (amendment provisions of 1990 Trust Agreement); ECF 13-3, § 11.02 (same for January 1, 1990 Regulations); ECF 13-4, § 11.02 (same for July 1, 1990 Regulations). Thus, the Plan argues: "[B]ecause Plaintiff has not plausibly alleged that 'the plan amendment formalities [were] satisfied,' his claims that the alleged Merger Agreement amended the Plan are inherently implausible and must be dismissed." ECF 13-1 at 18 (quoting *Evans v. Sterling Chems., Inc.*, 660 F.3d 862, 871 (5th Cir. 2011)).

On its face, the Plan's textual argument seems sound. But in his Opposition, Jordan argues that his "allegations support an inference that certain provisions in the Merger Agreement . . . were validly incorporated into the Plan Document in one of three ways." ECF 16 at 22. First, Jordan claims that he has sufficiently alleged that the majority of Trustees approved the relevant provisions of the Merger Agreement in accordance with the required amendment procedures. *Id*. at 22-29. Second, he asserts that he has plausibly alleged that the relevant provisions of the Merger Agreement were incorporated via Section 4.1 of the Trust Agreement. *Id*. at 29-30. And third, plaintiff maintains that he has set forth allegations sufficient to create an inference that the Plan likely ratified the terms of the Merger Agreement. *Id*. at 31-34. For its part, the Plan responds that the Complaint set forth none of these theories and that any amendment to the Complaint to incorporate them would be futile as "implausible." ECF 18 at 2-16. I address each theory, in turn.

As noted, at this stage, Jordan must make factual claims sufficient to plausibly allege that the Trustees abused their discretion in their determination to deny Jordan pension credit for the

periods at issue in this action.  However, the abuse of discretion gloss adds little here.  If the Merger Agreement did not amend the Plan's terms (or the Plan's terms were not otherwise modified), then there can be no argument that the Trustees abused their discretion.  But, if the Plan's terms *were* amended, as Jordan alleges, then the Trustees' failure to adhere to the amended terms could provide ground for abuse of discretion.

In *Carroll v. Continental Automotive*, 685 F. App'x 272 (4th Cir. 2017) (per curiam), the Fourth Circuit upheld the district court's ruling that a plan's denial of benefits was an abuse of discretion because it was contrary to the plain language of the plan.  It said, *id.* at 274:

> Under the abuse of discretion standard, "the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *United McGill Corp. v. Stinnett*, 154 F.3d 168, 170–71 (4th Cir. 1998) (internal quotation marks omitted).  However, "even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353 (4th Cir. 2008). The discretionary authority to interpret a plan "is not implicated . . . [when] the terms of the plan itself are clear." *Kress v. Food Emp'rs Labor Relations Ass'n*, 391 F.3d 563, 567 (4th Cir. 2004).

The question, then, is whether plaintiff has adequately alleged that the Regulations were amended.

### 1. Approval by the Plan Trustees

Jordan first argues that, by its terms, the Regulations can be amended by a majority of the Trustees at any time and in any manner.  The relevant provision requires approval of MEBA and the participating employers for any amendment "that results in any increase in the cost of the benefit program prevailing prior to such amendment."  ECF 13-8, § 8.6(a).  Jordan argues that this approval was obtained, for the reasons outlined in his second argument, *infra*.

Jordan asserts that because "MEBA directly controls its half of the Plan's Trustees," any writing adopted by MEBA to amend the Regulations is deemed approved by one-half of Plan Trustees.  Likewise, when a Trustee independently assents to a writing that would, if approved by the Trustees, amend the Regulations, this constitutes sufficient approval by that Trustee of such an amendment.  The Complaint alleges that MEBA approved, in the Merger Agreement, the pension credit terms as outlined by Jordan.  According to the Complaint, at least one employer Trustee (Keystone's Ristine) approved such terms.  Therefore, according to Jordan, the Merger Agreement validly incorporated these terms into the Regulations.  ECF 16 at 22-29.

The Plan maintains that this contention is not set forth in the Complaint.  Under Fed. R. Civ. P. 8(a), a complaint need only "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  The rule also requires that "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P 8(d)(1).  The goal of Rule 8 is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957); 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202 (3d ed.) (describing the objectives of Rule 8).  Although a complaint must contain more than "'naked assertions of wrongdoing,'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted), or mere speculation, *Twombly*, 550 U.S. at 555, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Id*.

Therefore, Jordan is not required, at this stage of litigation, to provide the sort of detailed facts that the Plan demands.  This is especially so given that Jordan does not actually have a copy of the Merger Agreement.   Jordan repeatedly and unambiguously alleges that the Merger Agreement amended the terms of the Plan.  ECF 1, ¶¶ 8, 28-31, 38.  This is sufficient to give the Plan fair notice of the substance of his claim.

In any event, when looking at the specific allegations in the Complaint, Jordan adequately set forth factual allegations supporting his contention.  The Complaint alleges that the Merger Agreement was entered into by UMOA and MEBA.  *Id*. ¶ 8.  According to the Complaint, the Merger Agreement contained provisions to provide UMOA members with pension credit for the disputed period.  *Id*. ¶¶ 8, 28-31, 38.  Further, the Complaint states that a MEBA fact sheet about the merger indicated UMOA members would be able to transfer to the Plan.  *Id*. ¶ 23; ECF 1-3.  And, the Complaint alleges that Morrill, an "authorized agent" of MEBA, assured Jordan that under the merger he could receive Plan pension credit for his Keystone service and could enroll in the plan.  ECF 1, ¶ 22.

The Complaint also alleges that Ristine, on behalf of Keystone, explained to Jordan that a clause in the proposed Merger Agreement required MEBA to use its best efforts to allow UMOA members to participate in the Plan.  *Id*. ¶ 24; ECF 1-4.  And, plaintiff asserts that Ristine indicated that, based on Keystone-UMOA merger discussions, UMOA members would receive an economic package that included Plan participation.  ECF 1, ¶ 25; ECF 1-5.

The Plan argues that Morrill's statements cannot be a basis for a claim against the Plan because Jordan provides no factual basis for his assertion that Morrill was an agent of UMOA, MEBA, and the Plan.  ECF 13-1 at 26-27.  However, the Complaint alleges that Morrill "was recruited by MEBA president Gene DeFries and UMOA president Chuck Mulloy to encourage UMOA members to vote in favor of the planned merger between MEBA and UMOA," and to that end Morrill discussed the proposed merger with UMOA members.  ECF 1, ¶¶ 21, 22.

Moreover, I must assume the truth of the allegations at this juncture.  At the motion to dismiss stage, plaintiff's allegation suffices to allege that Morrill was an agent of MEBA at the

relevant time.  *See Proctor v. Metropolitan Money Store Corp.*, 579 F. Supp. 2d 724, 735 (D. Md. 2008) (describing the law for alleging agency relationships at the motion to dismiss stage).

As to Ristine, the Plan argues that Jordan has not plausibly alleged that Ristine was wearing his Plan fiduciary hat when he made the statement in question.  ECF 13-1 at 27-28.  Jordan responds that when a trustee amends a plan, he is acting as a settlor, not a fiduciary.  ECF 16 at 19-21.  But, the facts as alleged are sufficient to show that Ristine was an agent of Keystone.

The Plan also argues that the statements of Morrill and Ristine cannot impact the validity of Jordan's claim because the Plan SPD provides that no one other than the Trustees may interpret the Plan or make benefits promises, and that participants should not rely on anyone's oral advice. ECF 13-5 at 4; ECF 13-6 at 3.  But, as Jordan points out (ECF 16 at 27), the statements were included as factual allegations to support Jordan's claims regarding the Merger Agreement, not as a basis themselves for any claim.

Taking plaintiff's allegations as true, and drawing all reasonable inferences in his favor, the Complaint alleges that MEBA supported the asserted pension credit provisions and approved a Merger Agreement containing them.  In addition, plaintiff alleges that Ristine, who was a Plan Trustee, likewise assented to a writing containing such provisions.  Even if the Complaint alleges that both MEBA and Ristine assented to the pension credit terms that Jordan asserts were included in the Merger Agreement, however, this does not support a benefits denial claim.

Jordan essentially argues that any time a majority of Trustees approves a writing, in any context, this suffices to amend the Regulations.  But, as discussed *supra*, while ERISA does not mandate specific plan amendment procedures, it does require that those procedures be followed. *See Curtiss-Wright Corp.*, 514 U.S. at 85; *HealthSouth Rehabilitation Hosp.*, 101 F.3d at 1009 ("oral and informal amendments to established ERISA plans are completely incapable of altering

the specified terms of the plan's written coverage"); *Coleman*, 969 F.2d at 58-59 ("[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing.").

The 1990 Trust Agreement and the Regulations granted broad authority to the Trustees to amend the Regulations.  But, they also set forth specific procedures as to how the Trustees were required to act.  Meetings of the Trustees must be held at places called by the Chairman and Secretary, and must be held with five days' written notice unless waived by unanimous consent. ECF 13-8, § 5.1.  All meetings require a quorum of at least four Trustees, two of whom must be from MEBA and two of whom must be from the employers.  *Id*. § 5.2.  "The Trustees shall keep full minutes of all their meetings, resolutions, and actions."  *Id*. § 5.4.  Furthermore, individual Trustees "may not take any action for or on behalf of the Trustees between meetings, except as may be specifically authorized."  *Id*. § 5.1.  Any action taken by the Trustees, by majority vote, shall be evidenced by a certificate of the Chairman and Secretary.  *Id*. § 4.12.

Here, the terms of the Trust Agreement are unambiguous.  *Cf. World–Wide Rights Ltd. P'ship*, 955 F.2d at 245 (stating that if the terms of a contract are unambiguous, the Court may interpret the contract as a matter of law).  They do not grant the Trustees the freewheeling individual authority Jordan asserts, whereby any time a majority of Trustees independently assent to a writing, that writing may serve to amend the Regulations.  Instead, the Trust Agreement prescribes procedures by which the Trustees must act, at specific, scheduled meetings, and not outside of them, except when authorized.  ERISA requires adherence to these procedures.

Beyond the bald assertion that the Merger Agreement amended the Regulations, Jordan makes no allegations in his Complaint that the Trustees approved the relevant provisions of the Merger Agreement in the manner required by the Trust Agreement.  Therefore, the claim that

writings were approved by individual Trustees outside of these procedures must fail. This is consistent with ERISA's overall emphasis on "reliance on the face of written plan documents." *McCutchen*, 569 U.S. at 100-01.

Jordan cites a number of cases for the proposition that writings executed separately from a plan document, and not labelled as an amendment, may nonetheless amend an ERISA plan. This is true as a general matter, but not the issue here. A writing executed separately may amend an ERISA plan, but it still must be adopted in conformity with the amendment procedures specified in the plan. Thus, in *Halliburton Co. Benefits Committee v. Graves*, 463 F.3d 360 (5th Cir. 2006), which is cited by both parties, the Fifth Circuit affirmed that a merger agreement had validly amended an ERISA plan because the plan entitled "'[t]he Company'" in question to amend or modify the plan. *Id*. at 372 (quoting the plan). However, the court recognized that "only an amendment executed in accordance with the plan's procedures is effective." *Id*. (internal citations omitted). Although the *Halliburton* amendment had been approved by the CEO and board of directors, it was not signed by the Vice President of Human Resources, as specified in the plan. But this was permissible because the plan vested the amending power in "the Company," and under corporate law principles the company could revoke its delegation of authority and exercise the power in some other way. *Id*. at 373-74. This is not a situation analogous to the one here.

None of the other cases cited by Jordan disputes that a plan's amendment procedures must be followed. *See Evans*, 660 F.3d at 871 ("[A]s long as an agreement is in writing, it contains a provision directed to an ERISA plan, and the plan amendment formalities are satisfied, such agreement or other document will constitute a valid plan amendment."); *Allison v. Bank One-Denver*, 289 F.3d 1223, 1234-36 (10th Cir. 2002) (informal and ambiguous memorandum did not constitute a plan amendment); *Aldridge v. Lily-Tulip Inc. Salary Retirement Plan Benefits Comm.*,

40 F.3d 1202, 1209-11 (11th Cir. 1994) (plan termination governed by different procedures than amendment under ERISA); *Horn*, 938 F.2d at 127-28 (board resolution valid amendment when signed by directors authorized by plan to amend); *Franklin v. First Union Corp.*, 84 F. Supp. 2d 720, 726-28 (E.D. Va. 2000) (plan authorizing amendment through "the Company, through action of the Board" authorized amendment by board resolution, and through delegation and ratification under corporate law principles).

Jordan has alleged that MEBA and Ristine assented to writings containing the disputed pension credit terms, and that these actions amended the Plan. But, such conduct, even if proven, does not comply with the specified process for amending the Plan under the Trust Agreement. Therefore, to the extent that Jordan alleges that the Plan was amended by way of such action, his claim must fail.

## 2.  Agreement Between MEBA and Keystone

As to Jordan's second contention, he asserts that MEBA and Keystone agreed to a contract extension that included the pension credits. And, he claims that such an agreement amounted to an alternative method of amending the Plan. In support of this argument, Jordan points to Section 4.1 of the Trust Agreement, which provides: "The existing benefits and eligibility rules in effect shall continue in effect, except as the Pension Trust Regulations may be hereafter modified *by agreement between the Association [meaning MEBA] and the participating Employers* or by the Trustees . . . ." ECF 13-8, § 4.1 (emphasis added).

According to plaintiff, Section 4.1 creates an alternate amendment procedure, by which MEBA and Keystone could have implemented the provisions of the Merger Agreement, even without action by the Trustees. And, he maintains that the Complaint plausibly alleges that MEBA

and Keystone reached such an agreement via a contract extension shortly after the merger.  ECF 16 at 29-30.

The Plan argues, *inter alia*, that this contention is not set forth in the Complaint.  ECF 18 at 11-13.  Therefore, the claim must fail.  Again, the Plan demands too much from Jordan at this stage of the litigation.

The Complaint alleges that UMOA and MEBA entered into the Merger Agreement.  ECF 1, ¶ 8.  Further, the Complaint alleges that the Merger Agreement contained provisions seeking to provide UMOA members with pension credit for the disputed period.  *Id*. ¶¶ 8, 9, 31.  In addition, Jordan alleges that a MEBA fact sheet about the merger indicated UMOA members would be able to transfer to the Plan.  *Id*. ¶ 23; ECF 1-3.

Further, plaintiff alleges that Morrill, an "authorized agent" of MEBA, assured Jordan that under the merger he could receive Plan pension credit for his Keystone service and could enroll in the plan.  ECF 1, ¶ 22.  Moreover, Jordan asserts that Ristine, on behalf of Keystone, explained that a clause in the proposed Merger Agreement required MEBA to use its best efforts to allow UMOA members to participate in the Plan, and that Keystone would "support the ultimate position of the majority" in the matter of the merger.  *Id*. ¶ 24; ECF 1-4.  And, Jordan alleges that Ristine indicated that Keystone-UMOA merger discussions led to an understanding that an upcoming contract extension would "recogniz[e] the successor organization" and provide UMOA members with an economic package that included Plan participation.  ECF 1, ¶ 25; ECF 1-5.

These allegations adequately plead a claim of an agreement between MEBA and Keystone.  From the allegations, it is reasonable to infer that both MEBA and Keystone supported the pension credit that Jordan claims was incorporated into the Regulations.  Ristine's letter of April 2, 1990, indicates that Keystone and UMOA had reached an understanding for a contract extension

including "the same economic package provided the Licensed Engineers," including Plan participation. ECF 1, ¶ 25; ECF 1-5.  It is reasonable to infer that this understanding as to a contract extension was put into place as an actual contract extension.  And, it is reasonable to infer that the extension was between Keystone and MEBA, because the merger had just been approved a few days before Ristine's letter.

The Plan offers several responses to this contention.  First, the Plan argues that simply because Keystone and MEBA may have supported the merger, this does not mean they executed an agreement to that effect, and that Jordan has pled no facts regarding any such agreement.  ECF 18 at 11.  But, Jordan has adequately pled facts that Keystone and MEBA subsequently agreed to a contract extension, and that this extension contemplated participation in the Plan for UMOA members, as discussed.

Second, the Plan argues that Section 4.1 of the Trust Agreement requires agreement between MEBA and all participating employers, or at least more than one, based on the phrase "participating employers."  *Id*. at 11-12.  Jordan, meanwhile, interprets this provision to permit agreements between MEBA and any single employer.  ECF 16 at 29-30.  Under contract law provisions, courts look to the ordinary meaning of "participating employers" as a reasonable person in the position of a Plan participant would have understood them, and looking to the plan as a whole. *See Jenkins*, 77 F.3d at 743; *Am. United Life Ins. Co.*, 716 F.3d at 820; *Goodman*, 7 F.3d at 1127.  On the whole, there is little in the rest of the Trust Agreement to resolve this dispute.

Section 8.8 provides that "[w]herever required by context, the singular of any word shall include the plural and the plural may be read in the singular."  ECF 13-8, § 8.8.  "Employers" is defined as "the various Employers who are obligated by collective bargaining agreement to make the necessary contributions to the Plan in behalf of covered employees."  *Id*., § 1.1.  Both

interpretations seem plausible, which means the Trust Agreement is ambiguous.  And, in the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 394 (D. Md. 2011) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir.1972)).

The Plan's final argument here is that "while the 1990 Trust Agreement may have potentially permitted MEBA and the Plan's participating employers to agree to modify the Plan Document's 'existing benefits and eligibility rules,'" Jordan alleged that the Regulations had been amended, and the Regulations only authorize amendment via the Trustees.  ECF 18 at 12-13 (quoting ECF 13-8, § 4.1).  It is true that the Complaint alleges that the Regulations had been amended.  ECF 1, ¶ 8.  And, it is true that the Regulations themselves only permit amendment by the Trustees.  ECF 13-3, § 11.02; ECF 13-4, § 11.02.  But, as discussed, if a plan's amendment procedures were followed, then a writing may amend the plan even if not formally labelled an amendment or integrated into the document being amended.  In view of the ambiguity outlined above, the Trust Agreement may have allowed for amendment of existing benefits and eligibility rules by agreement of MEBA and one employer—Keystone.  And, if such an agreement altered the terms set forth in the Regulations, then it "amended" the Regulations for all practical purposes.

The proof may not bear out Jordan's claim.  But, the Complaint sets forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely," *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

The facts in the Complaint plausibly allege that the pension credit terms of the Merger Agreement were incorporated into the Plan via Section 4.1 of the Trust Agreement.

47

### 3.   Ratification

Jordan argues that the statements by Morrill and Ristine, as well as the post-merger evidence that MEBA's Vacation Plan operated in accordance with the Merger Agreement, are sufficient to "create an inference that the Plan likely ratified the terms of the Merger Agreement," even if the Merger Agreement did not properly amend the Regulations.  ECF 16 at 31-34.

Even assuming that Jordan asserted this contention in his Complaint (and even putting aside the Plan's arguments as to whether communications by Morrill and Ristine may be relied upon here), it would fail to state a claim.  As noted, the Fourth Circuit has held that "oral and informal amendments to established ERISA plans are completely incapable of altering the specified terms of the plan's written coverage."  *HealthSouth Rehabilitation Hosp.*, 101 F.3d at 1009; *see also Coleman*, 969 F.2d at 58-59 ("[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing. Oral or informal written modifications to a plan . . . are of no effect." ); *Biggers*, 4 F.3d at 295 ("Oral or informal written amendments are inadequate to alter the written terms of a plan, as this practice would undermine certainty.").  Likewise, "informal and unauthorized amendment[s are] . . . as a matter of law . . . impermissible."  *Pizlo*, 884 F.2d at 120.  "[A] court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman* 969 F.2d at 56.  These decisions favoring written, formal amendments, and prohibiting oral and informal amendments, bar recognition of an amendment on the basis argued by Jordan.

*Elmore v. Cone Mills Corp.*, 23 F.3d 855 (4th Cir. 1994), is instructive.  There, the defendant company made representations about the contribution of a pension reversion surplus to an ERISA plan prior to the adoption of the plan, but not actually incorporated into formal plan

documents.  The district court ruled that these were part of the plan because this "promise to provide benefits was contained in a written, formal, authorized, and ratified statement sent by the employer's CEO to all of the employer's salaried employees."  *Id*. at 861.  The Fourth Circuit reversed, concluding that "only representations adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan."  *Id*. (citing *Miller v. Coastal Corp*., 978 F.2d 622, 624 (10th Cir. 1992), *cert. denied*, 507 U.S. 987 (1993)).  The plan's documents prescribed more complex amendment procedures that had not been followed.  *Id*.

If ratification at the level of formality in *Elmore* was insufficient to validly amend a plan, it is difficult to see how the Complaint states a claim for ratification.  That is especially so given that there are no allegations that the Plan ever operated in accordance with the alleged pension credit provisions, and that the only post-Merger Agreement action Jordan can point to (aside from Ristine's letter three days after the vote) are the alleged practices of an entirely separate ERISA plan.

Jordan acknowledges these Fourth Circuit decisions, but argues they may be "inconsistent" with the Supreme Court's decision in *Curtiss-Wright Corp.*, 514 U.S. 73.  But, the Fourth Circuit itself seems to disagree.  In *HealthSouth Rehabilitation Hospital*, 101 F.3d at 1009, decided after *Curtiss-Wright Corp.,* it reiterated that "oral and informal amendments to established ERISA plans are completely incapable of altering the specified terms of the plan's written coverage."  A careful read of *Curtiss-Wright Corp.* supports this view.  In *Curtiss-Wright Corp.*, the Court said that ERISA requires an amendment procedure, but does not impose substantive requirements as to what that procedure might be.  514 U.S. at 78-86.  Therefore, the Court upheld a minimalist amendment procedure providing that "[t]he Company reserves the right at any time and from time to

modify or amend, in whole or in part, any or all of the provisions of the Plan." *Id*. at 76.  But, the Court affirmed that plan amendments must be adopted in accordance with the plan's amendment procedure.  *Id*. at 85.  And here, the Plan's amendment procedure is considerably more complex.

Likewise, *Curtiss-Wright Corp.* concluded that when the amending power is vested in a company, courts should look to corporate law principles in determining whether "the company" has acted.  *Id*. at 80-81, 85.  Such principles allow for subsequent action to ratify amendments adopted by unauthorized corporate officers.  *Id*. at 85.  But, this doctrine simply does not apply here, where the Plan's amendment procedure is not analogous.

The other cases cited by Jordan are similarly inapplicable.  *See Halliburton*, 463 F.3d at 373-75 ("The Company may amend"); *Depenbrock v. Cigna Corp.*, 389 F.3d 78, 82-84 (3rd Cir. 1984) (amendment authority vested in CEO); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 29 F. Supp. 3d 1175, 1193-96 (W.D. Wis. 2014) ("reluctant[ly]" endorsing ratification for plan vesting amendment power in "[t]he Employer," when board adopted resolution and plan was administered accordingly, but amendment was not executed as required through "sheer oversight"); *Franklin*, 84 F. Supp. 2d at 726-28 ("the Company" may amend); *Colville Confederated Tribes v. Somday*, 96 F. Supp. 2d 1120, 1130-39 (E.D. Wash. 2000) (concerning government plan largely exempt from ERISA).  Here, the Complaint does not set forth facts that, if true, constitute ratifications of the Merger Agreement.

In sum, under the standard of review applicable to Rule 12(b)(6) motions, Jordan has plausibly alleged that the Regulations were modified, via an agreement between Keystone and MEBA.  But, he has not set forth facts sufficient to show Trustee approval and ratification.

### C. Governing Document Provision

The Plan argues that a § 502(a)(1)(B) claim by Jordan must fail because Jordan has not cited any provision in the Plan's governing documents entitling him to the benefit he seeks. ECF 13-1 at 22-23. Further, it notes that no provision of any of the three versions of the Regulations before the Court contains such a provision. And, the Plan contends that it would be futile for Jordan to amend his complaint to claim that the Trustees had amended the Regulations because this would be contradicted by the text of the Regulations. *Id.* at 23 n.2; ECF 18 at 10. Jordan responds that this argument is "technically correct," but that is because he alleges the entitlement is contained in the Merger Agreement, which he does not possess but hopes to obtain through discovery. ECF 16 at 35 n.20.

The parties are largely talking past each other. Certainly, a § 502(a)(1)(B) claim must be premised on "the terms of the plan," based on the statute. And, as discussed, these terms will almost always be in writing. *See, e.g.*, 29 U.S.C. § 1102(a)(1) (stating that "[e]very employee benefit plan" must be "established and maintained pursuant to a written instrument"); *Heimeshoff*, 571 U.S. at 108 ("[O]nce a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'"); *Curtiss-Wright Corp.*, 514 U.S. at 83 (recognizing that ERISA's statutory scheme "is built around reliance on the face of written plan documents"). So, the cases cited by the Plan dismiss § 502(a)(1)(B) claims that failed to identify any term or provision entitling the plaintiffs to the benefits at issue. *See Glendale Outpatient Surgery Ctr. v. United Healthcare Servs.*, 805 F. App'x 530, 531 (9th Cir. 2020) (Mem.); *Prof'l Orthopaedic Assocs., PA v. 1199SEIU National Benefit Fund*, 697 F. App'x 39, 41 (2d Cir. 2017) (Mem.); *Piscopo v. Pub. Serv. Elec. and Gas Co.*, 650 F. App'x 106, 110 (3d Cir. 2016).

51

Here, the parties disagree as to the effect of the Merger Agreement.  Jordan asserts that the Merger Agreement (or the Keystone-MEBA contract extension, reflecting the terms of the Merger Agreement) amended the Plan, and that its terms entitle him to the benefits he seeks.  The Plan argues no amendment ever occurred.  But, Jordan relies on the documents mentioned above to support the "terms of the plan" upon which his claim is premised.  Because he has been unable to obtain a copy of the Merger Agreement, he cannot provide more specific language.

*Colin v. Marconi Commerce Systems Employees' Retirement Plan*, 335 F. Supp. 2d 590 (M.D.N.C. 2004), is instructive.  Plaintiffs brought a § 502(a)(1)(B) wrongful denial of benefits claim arguing, in part, that they were wrongfully denied pension credit based on documents that purportedly supplemented the plan in question, but which neither party presented to the court and which were not reflected in the plan restatements in evidence.  *Id*. at 603-04.  The court, which was proceeding under the abuse of discretion standard, did not dismiss the claim for failure to cite a specific provision.  Rather, it ruled that "judgment on the pleadings [was] inappropriate" because, "[a]ssuming the documents did amend the plan, the court is presently unable to determine whether the [defendants] interpreted the terms reasonably in denying [plaintiffs] the benefits they seek." *Id*. at 604.

The Plan leans too heavily on the fact that Jordan's alleged entitlement is not reflected in the Regulations.  As a preliminary matter, "an ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling." *McWilliams*, 1999 WL 64275, at *2 (citing *Bolton*, 56 F.3d at 1058). Although Jordan's denial occurred in 2019 (ECF 1, ¶¶ 32-35), the Regulations as of 2019 have not been supplied to the Court.  The 2020 Regulations reflect a 2020 amendment.  *See* ECF 13-2 at 2.

At this stage, I cannot simply assume that the 2019 Regulations reflect the 2020 Regulations, or the 1990 Regulations, in relevant part.

Moreover, as discussed, "multiple documents may 'collectively form' an employee benefit plan, and those documents need not 'be formally labelled' as comprising the plan." *Minerley*, 801 F. App'x at 864-65 (HMO policy); *see also Halliburton*, 463 F.3d at 371-74 ("'[A]ny act that is directed to a provision of an ERISA plan may be deemed to constitute a plan amendment even though it does not recite that it is intended to amend the plan and it is not included in a plan document.'" (quoting JOHN F. BUCKLEY, ERISA LAW ANSWER BOOK –7 (5th ed.2006))); *Horn*, 938 F.2d at 127-28 (amendment by board resolutions); *In re U.S. Airways, Inc.*, 2007 WL 2416536, at *5 (citing *Horn*, 938 F.2d at 127); *Normann*, 956 F. Supp. at 162-63) (amendment by board resolutions).  *If* the terms alleged by Jordan were adopted in writing and via the Plan's formal amendment procedures, *see Elmore*, 23 F.3d at 861; *Coleman*, 969 F.2d at 58-59, then they are still valid and binding, even if they do not appear in the Regulations.  And, Jordan's suit does not fail merely because he has not, at this stage, cited with specificity the specific provision he alleges entitles him to the disputed pension credit.

### D.  Availability of Discovery

I shall briefly discuss the Plan's last argument, which is that even if Jordan survives a motion to dismiss, "he would not be entitled to discovery," because the case is reviewed for abuse of discretion.  ECF 13-1 at 28-31.  Discovery is crucial to Jordan's claim, which is premised on the alleged contents of documents that Jordan has not obtained.  *See* ECF 1, ¶ 29.  Jordan responds that this principle does not apply "in cases where the document constituting the plan amendment has not yet been produced," citing two cases: *Marconi*, *supra*, and *Johannssen v. Dist. No. 1 – Pacific Coast Dist., MEBA Pension Plan*, 136 F. Supp. 2d 480 (D. Md. 2001).  ECF 16 at 34-36.

The Plan replies that these cases should be accorded little weight because discovery does not appear to have been contested or analyzed in any detail.  ECF 18 at 21-24.

As discussed, the abuse of discretion standard appears appropriate in this case.  The Plan is certainly correct that "[g]enerally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion."  *Helton*, 709 F.3d at 353–54 (citing *Sheppard*, 32 F.3d at 125).  But, the Plan's contention that discovery is *never* possible in an abuse of discretion case does not reflect the law in the Fourth Circuit.

In *Helton*, 709 F.3d at 352, the Fourth Circuit extensively discussed this issue, remarking that "we have taken a more nuanced approach to consideration of extrinsic evidence on deferential review, rather than embracing an absolute bar."  The Court reasoned that "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the [*Booth* abuse of discretion] factors *and* the evidence was known to the plan administrator when it rendered its benefits determination."  *Id*. at 356 (emphasis added).  Otherwise, the federal courts "would have effectively surrendered [their] ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that would suggest their decisions were unreasonable."  *Id*. at 353.  And, under the principles of agency law, "an ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records."  *Id.* at 356.

It is not clear from the record what evidence was known to the Trustees, as the Plan administrator, when making the determination as to Jordan.  The Trustees' letter denying Jordan's claim indicates that the Trustees considered "the Administrator's October 25, 2019 memorandum; all documents contained in the three-ring binder you submitted to the Plan Office; the provisions

of the Service Contract Act; and the Plan Regulations."  ECF 1-8 at 2.  But, the record does not indicate what was contained or cited in Jordan's three-ring binder or the Administrator's October 25 memorandum.  Nor does this resolve what knowledge the Trustees "acquired by [their] employees in the scope of their employment" or from "the contents of [their] books and records," *Helton*, 709 F.3d at 356.

Several factors could be implicated in regard to abuse of discretion, including "the language of the plan" and "the adequacy of the materials considered to make the decision and the degree to which they support."  *Booth*, 201 F.3d at 342.  To determine if the Plan abused its discretion, the terms of the Plan are critical.  But, the question remains as to the effect, if any, of the Merger Agreement.  The Plan is wrong in regard to its assertion that discovery can be definitively precluded at this stage of the case is wrong.

## IV.    Conclusion

To survive the Motion, Jordan need only make factual claims sufficient, when taken as true and drawing all reasonable inferences in his favor, to plausibly allege that the Trustees abused their discretion by denying Jordan pension credit for the periods at issue in this action.  Applying this standard, he has pled facts in his Complaint sufficient to plausibly allege that the Regulations were modified via agreement between Keystone and MEBA incorporating the pension credit terms of the Merger Agreement.  Jordan has plausibly alleged that the Trustees abused their discretion in denying him the pension credit.  I will deny the Motion.

A separate Order follows.

Date:   September 10, 2021                               _____/s/_____

                                                         Ellen L. Hollander
                                                         United States District Judge